IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**D.T**., and **G.M**., individuals, filing under
fictitious names,

        Plaintiffs,

        v.

**J. MICHAEL SHOEMAKER**, an
individual; **THE MOVEMENT CENTER,
INC.**, a Massachusetts non-profit corporation
authorized to do business in Oregon;
**L'HERMITAGE, LLC.**, a Delaware limited
liability company authorized to do business in
Oregon; **SHARON M. WARD**; **MONICA
ONEAL**; **JEN WILHELM**; **ANDREW
BONNER**; and **REBECCA REESE**,
individuals,

        Defendants.

No. 1:23-cv-891-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

Plaintiffs G.M. and D.T.—former members of Defendant The Movement Center (the

"Center")—bring claims of sexual assault and sex trafficking against the Center and numerous

Defendants associated with it. Defendants move to dismiss all of Plaintiffs' claims. Most relevant

here, Defendants argue Plaintiff D.T.'s claims are all barred by the relevant statutes of

limitations. As discussed below, the Court agrees.

**BACKGROUND**[1]

The Center is a Massachusetts nonprofit corporation centered around yoga, meditation, retreats, and associated trainings and educational opportunities. First Am. Compl. ("FAC") ¶ 22; ECF No. 23. The Center was based in Multnomah County until 2019, when it moved to Gold Beach, Oregon. Defendant Michael Shoemaker, also known as "Swami Chetanananda," "is the founder, President, teacher, director, and leader of the Center. FAC ¶ 21. Defendant Sharon Ward, also known as "Sadhvi Parananda," is the Managing Director, Registered Agent, and Secretary of the Center. FAC ¶¶ 22, 24. Defendants refer to the Center, Shoemaker, Ward, and L'Hermitage[2] as "the Primary Defendants." As alleged in the FAC:

> Defendants represented to the public including to Plaintiffs, that Defendant Shoemaker could heal, and in some cases cure, his students both physically and psychologically, as long as they unquestioningly obeyed his orders and expressed unconditional acceptance and loyalty to his decision-making and advice. Within the Center and Defendant Hermitage, members revered Defendant Shoemaker's word as the highest authority, and the Center and Defendant Hermitage held itself out as a safe space to take classes and study Defendant Shoemaker's teachings.
>
> Defendants led vulnerable young women, including Plaintiffs, to believe that if they cut ties from their teacher Defendant Shoemaker, they would be incarcerated, become mentally ill, driven to suicide, or experience serious harm in other ways physically, psychologically, and emotionally.

FAC ¶¶ 6–7.

Defendants refer to the remaining Defendants—Monica ONeal, Jen Wilhelm, Andrew Bonner, and Rebecca Reese—as the "Secondary Defendants." The Secondary Defendants were "part of Defendant Shoemaker's inner circle of employees" at the Center. FAC ¶ 5. These Secondary Defendants are alleged to have recruited women, including Plaintiffs, to be sex trafficked by Shoemaker. FAC ¶ 4. In addition to being members of the Center, Defendant

---

[1] At the motion to dismiss stage, this Court takes all of Plaintiff's allegations as true. *See Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000).

[2] L'Hermitage, LLC was organized in 2018 and appears to be an alter ego of the Center organized as a Delaware LLC.

Bonner and Defendant Reese are physicians who, while serving as doctors and employees of the Center, each "met with and treated female students, such as Plaintiff D.T., for physical and sexual harm inflicted by Defendant Shoemaker" and "observed the sexual injuries sustained by Plaintiff D.T." FAC ¶¶ 27–28.

In 1971, Shoemaker founded Nityananda Institute, which would later become the Center. FAC ¶ 30. In 1973, Shoemaker allegedly raped a student at the Nityananda Institute.[3] FAC ¶ 31. After allegations "that the Nityananda Institute engaged in cult-like behavior," Shoemaker moved the Institute to Portland, Oregon in 1993. FAC ¶ 32. There, Shoemaker purchased a 3-acre, 62,000-square-foot estate that could house approximately 100 members. FAC ¶ 32. In 2001, the Oregonian published a five-part series on Shoemaker and the Institute titled *In the Grip of the Guru*. FAC ¶ 34. "The series contained allegations from dozens of former students claiming that Defendant Shoemaker exploited them financially, spiritually, and sexually." FAC ¶ 34. Following 2018 allegations (on Facebook) from a member who claimed being sexually assaulted "at the hand or direction of Defendant Shoemaker," Shoemaker sold the Portland estate and moved the community to Gold Beach. FAC ¶ 36.

D.T began researching meditation programs in approximately 1999. FAC ¶ 41. That year, then 23-year-old D.T. was diagnosed with Hodgkin's Lymphoma. After a year of painful chemotherapy and radiotherapy, "D.T. was in remission, but she still felt lost and decided to seek guidance." FAC ¶ 41. In the summer of 2000, D.T. visited a meditation retreat at an ashram in Australia led by Swami Shankarananda." FAC ¶¶ 41–42. A few months later, D.T. moved into the ashram and worked full-time as that Swami's personal assistant. In 2004, a group of gurus from the United States, including Shoemaker, travelled to Melbourne to visit the ashram. FAC ¶

---

[3] Due to the seriousness of the allegations, the Court again notes that at this stage, it accepts each of the allegations as true.

43. During this time, D.T. developed Graves' Disease and nearly lost her eyesight. FAC ¶ 46. "Shoemaker noticed D.T.'s vulnerability and gave her significantly more attention than the other students." FAC ¶ 47. Shoemaker stayed in touch with D.T. and recommended she visit the Center. In late 2005, D.T. visited the Center for three months and received regular treatments from Defendants Bonner and Reese as well as "osteopathic treatments" from Shoemaker. FAC ¶ 51. "During this period, D.T. was heavily medicated and could barely see at times due to symptoms from her Graves' Disease and thyroid eye disease." FAC ¶ 51.

Shoemaker often invited D.T. to have lunch with him and his inner circle followed by tea with Shoemaker alone. FAC ¶ 52. During the last of the tea meetings, *Shoemaker attempted to kiss D.T. without her consent, but she stopped him. She was uninterested in him romantically, but rather looked up to him as a teacher, a healer, and authority figure*." FAC ¶ 53 (emphasis added). After three months at the Center, D.T. returned to Australia in early 2006.

In October 2006, Shoemaker paid for D.T. to travel from Australia to the Center. D.T. stayed at the center until January 2007. D.T. noticed members of the Center "venerated Shoemaker as a supremely powerful man. Spending time with him, or even being near him, was considered a privilege. He required complete obedience from his students and instilled a fear of reprisal should anyone disobey him." FAC ¶ 56. D.T. regularly attended classes led by Shoemaker. Attendees sat still and silently stared at Shoemaker, who stared back from a stage above the audience. "As an effect of these sessions, D.T. felt as though she had fallen into a trance." FAC ¶ 57. "Shoemaker advised D.T. to open her heart completely to him, to honor and cultivate the connection between her as a student and him as her teacher, and to surrender to him by dissolving all personal boundaries." FAC ¶ 58. Shoemaker began making more sexual advances towards D.T.; like forcing D.T. to sit on his lap. FAC ¶ 60. Shoemaker told D.T. that he

knew what was best for her, that he had saved her from a miserable life in Australia, and that

D.T. must do what he told her to do and "play the game by his rules." "After this period of time

in which Shoemaker assumed total control over D.T.'s behavior, thoughts, and emotions, he

initiated a sexual relationship with her." FAC ¶ 64. During this late 2006 visit:

> Shoemaker insisted that D.T. sleep with him. Shoemaker's sexual advances and touching escalated to kissing, digital penetration, and sexual intercourse. *D.T. was genuinely scared and intimidated by Shoemaker, and she felt overwhelmed by his aggressive energy. D.T. felt that she was unable to avoid or rebuff Shoemaker due to his roles as her teacher, healer, and leader of the Center*.

FAC ¶ 65 (emphasis added).

In January 2007, D.T. returned to Australia. A few months later, Shoemaker travelled to

Nepal and paid for D.T. to fly to Nepal to meet him. During the Nepal trip:

> Shoemaker coerced D.T. into sexual intercourse; however, Shoemaker became considerably more aggressive than previously. For example, Shoemaker entered her bedroom unannounced and began to have sex with her without her consent. Then for the first time, *without any warning or consent, Shoemaker choked D.T. with his hands while they were having sex and strangled her until she lost consciousness*.

FAC ¶ 72 (emphasis added).

In May 2007, D.T. flew from Nepal back to Australia (with a ticket purchased by

Shoemaker). Shoemaker told D.T. that her medical problems were due to an "emotional block"

and invited her back to the Center. D.T. returned to the Center in August 2007 and once again in

November 2007. Shoemaker "repeatedly barged into D.T.'s room unannounced to have sex. On

the first occasion, *D.T. was asleep and unable to consent when Shoemaker began having sex with

her*." FAC ¶ 77 (emphasis added). "*Shoemaker often choked D.T. without her consent* and

became more physically aggressive. *He pinned her down so she could not resist or move, pulled

her hair, and grabbed her by the neck, which caused D.T. pain and discomfort*." FAC ¶ 79

(emphasis added).

In June 2008, D.T. returned to the Center and her interactions with Shoemaker "became more volatile." FAC ¶ 81. In August 2008, Shoemaker invited D.T. to his apartment, telling D.T. that something "intense" was happening. FAC ¶ 82. Thinking she was attending a private meditation, D.T. went to Shoemaker's apartment:

> When D.T. walked into Shoemaker's apartment, the lights were off. Defendant ONeal cracked open the door for D.T. to enter. Once D.T.'s eyes adjusted to the dark, she saw ONeal standing there naked. *ONeal ordered D.T. to remove her clothes and crawl into the bedroom. D. T. was afraid of the potential reprisal that would occur if she did not listen to ONeal, and she complied.*

> When D.T. entered the bedroom, Shoemaker grabbed her and brought her to a table, where *he demanded that D.T. snort cocaine. Frightened and in shock, D.T. felt like she had no other choice*. After she ingested the cocaine, D.T. began to hyperventilate and could not breathe. Shoemaker picked her up and put her on his bed. *Throughout the rest of the night, Shoemaker and ONeal performed nonconsensual sex acts on D.T. D.T. repeatedly blacked out and did not feel in control of her body.*

> *Shoemaker and ONeal forced D.T. to put on a dog collar and wear clamps on her nipples for hours*. While disoriented from the drugs and unable to consent, let alone understand what was happening around her, Shoemaker and ONeal took at least one photo of D.T. engaged in different sex acts. ONeal then sent at least one photo of D.T. to unidentified men with whom she had been corresponding.

> ONeal and Shoemaker attempted to arrange a meet-up with the men and D.T. for sex, but D.T. was too incapacitated to leave. ONeal and Shoemaker called the men and forced D.T. to engage in sexual conversations while she was barely conscious.

> By morning, *D.T. was severely ill from the drugs*. ONeal took D.T. to ONeal's room, where *she vomited throughout the day. D.T. was also covered in cuts and bruises from Defendants' abuse*.

> Shoemaker assured D.T. that she had done excellently during the evening with him and ONeal. The following week, Shoemaker left the Center. He asked D.T. to send him naked photos of herself to show him the cuts and bruises.

> For a second time in August 2008, Shoemaker invited D.T. back to his room. She told him that she had become seriously ill following their last encounter, but he demanded that she return.

> In Shoemaker's living room, *Shoemaker again forced D.T. to take cocaine. Although D.T. was drugged, disoriented, and unable to consent, Shoemaker forced D.T. to perform oral sex on him repeatedly throughout the night even as*

*D.T. lost and regained consciousness. While she was performing oral sex, he smothered and gagged her.*

At one point, while she was heavily drugged, Shoemaker forced D.T. to engage in sexual conversations with unknown men over the phone. On information and belief, Shoemaker was arranging for her to meet these men.

D.T. began to vomit uncontrollably, and afterwards lay frozen on Shoemaker's couch.

D.T. remained at the Center for one more week. On August 20, 2008, she travelled back to Australia.

Before she left, *D.T. met with Defendants Dr. Bonner and Dr. Reese for treatment. She told them about the physical and sexual assaults that she endured, the group sex, and how she was forced to take drugs*. Bonner and Reese acknowledged Shoemaker's behavior and downplayed it to D.T., telling her that Shoemaker often takes cocaine with ONeal. *D.T. understood that her experience may be a common occurrence for the young women at the Center*. Instead of reporting Shoemaker to the police, Reese recommended that D.T. take a test for sexually transmitted diseases.

From November 2009 to September 2010, D.T. travelled to the Center for two retreats. Shoemaker continued to sexually exploit D.T.

In 2011, Shoemaker ceased all contact with D.T. until 2016.[4]

FAC ¶¶ 83–96 (emphasis added).

## STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

---

[4] There is no indication of the extent of any contact between Shoemaker and D.T. after 2011. The FAC indicates D.T. last visited the Center in September 2010. FAC ¶ 95. The Court presumes the last instance of sexual abuse occurred no later than September 2010.

When considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burget v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. A complaint is subject to dismissal if relief for the allegations is barred by an applicable statute of limitations. *Andersen v. Portland Saturday Mkt.*, No. 3:17-cv-01500-HZ, 2018 WL 2917357, at \*4 (D. Or. June 11, 2018) (citing *Jones v Bock*, 549 U.S. 199, 215(2007)). To dismiss a claim based on timeliness, it must be proved beyond a doubt that no set of facts would make the claim timely. *Id*. at \*2.

If a complaint is dismissed, the court must grant the plaintiff leave to amend unless it "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995). A plaintiff's time-barred claim may be dismissed without leave to amend since any amendment would be futile. *Platt Elec. Supply Inc. v. EOFF Elec. Inc.*, 522 F.2d 1049, 1060 (9th Cir. 2008).

## DISCUSSION

As discussed above, Defendants argue D.T.'s claims are each time-barred because the last alleged sexual assault occurred no later than September 2010, when D.T. left the Center for the last time. Whether Defendants are correct depends on whether D.T.'s claims are timely in light of ORS 12.118. The statute states:

> Notwithstanding [certain other statutes], an action based on conduct that constitutes sexual assault or conduct knowingly allowing, permitting or encouraging sexual assault that occurs when a person is 18 years of age or older must be commenced with five years from the date the person discovers, or in the exercise of reasonable care should have discovered, the causal connection between the sexual assault and the injury.

8 – OPINION AND ORDER

Because the statute applies to any "action based on conduct that constitutes sexual assault," the Court assumes that all of D.T.'s claims fall under ORS 12.118.[5] To determine whether D.T.'s claims are time-barred, the Court must determine when D.T. "discover[ed], or in the exercise of reasonable care should have discovered, *the causal connection between the sexual assault and the injury*." ORS 12.118 (emphasis added). Here, the specific factual allegations confirm that no later than August 2008, D.T. discovered not only that Shoemaker sexually assaulted her, but that the sexual assaults caused her physical injuries. Although D.T. may not have discovered the full extent of those injuries until years later, that fact does not make her claims timely.

D.T. argues that there is a question of fact as to whether she could reasonably connect her emotional injuries with the sexual assault:

> Whether someone *under these circumstances* would have recognized, at the time, that Shoemaker was sexually assaulting them and that they were psychologically injured by those assaults—separate from the assaults themselves—is a question of fact for the jury. It is also a question upon which Plaintiffs will offer expert testimony. The Oregon Court of Appeals has twice overturned dismissals in similar cases, recognizing that a perpetrator's psychological control over a victim, and a victim's mistaken identification of an abusive relationship as positive or romantic, may prevent a victim from making the causal connection between the abuse and injuries until years later.

Pl.s' Resp. 81; ECF No. 51.

Describing them as factually similar, D.T. cites to *Jasmin v. Ross*, 177 Or. App. 210 (2001) and *Skille v. Martinez*, 288 Or. App. 207 (2017). Pl.s' Resp. 81. Those cases, however, are not remotely analogous to the facts alleged here. In *Jasmin*, the 30-year-old Plaintiff sued her stepmother's brother "for damages resulting from his sexual abuse of her when she was between

---

[5] Although the parties disagree on whether ORS 12.118 applies to all of D.T.'s claims, the parties agree that absent equitable tolling, D.T.'s claims are time-barred unless (1) the statute applies and (2) D.T. did not discover, and could not have reasonably discovered, the connection between the sexual assaults and her injuries more-than five years before filing her claims.

the ages of 10 and 17." 177 Or. App. at 212. Because D.T. relies so heavily upon *Jasmin*, it is

important to understand the facts there at length:

> Defendant began sexually molesting plaintiff on a regular basis when she was around 10 years old, persuading her that he cared for her deeply and that they had a special relationship. By the time she reached her teens, *plaintiff believed that she and defendant were in love with each other*. Although he told her not to tell anyone about their relationship, it came to light when, at the age of 14, plaintiff talked about it to her stepmother and other members of her family. They responded by forbidding her to see defendant, but she continued to meet him in secret and the sexual activity continued as well. When she was 17, she told a school friend about her relationship with her step uncle. The friend reported the situation to school authorities. An investigation ensued; plaintiff related her situation to police and child protective authorities, but nobody pursued criminal charges, and the relationship continued in secret. Soon, however, plaintiff's father learned that plaintiff had been lying to him about the relationship. Caught in a conflict of loyalty and affection between her father and her step uncle, she attempted to commit suicide. Soon afterward, she moved out of state.
>
> As an adult, plaintiff has experienced a variety of psychological problems: inability to maintain relationships, drug and alcohol abuse, self-mutilation, explosive anger, and violence towards others. Her marriage ended after five years, and, at the time, she attributed its demise to her lingering love for defendant. She has repeatedly sought counseling in an attempt to deal with her problems. Although she would disclose the sexual aspect of the relationship on medical and mental health intake forms, *she continued to deny that the relationship was abusive or exploitative*.
>
> That situation changed, however, in July 1997, when she renewed her acquaintance with the high school friend in whom she had confided while young. *A conversation with him regarding their teenage years triggered plaintiff's realization that the relationship with her step uncle was abusive rather than romantic*. A mental health counselor, Julie O'Donnell, treated plaintiff shortly after this realization and diagnosed her as suffering from Post Traumatic Stress Disorder (PTSD), a condition common among adult survivors of childhood sexual abuse. According to O'Donnell, *these survivors typically believe their abusers' protestations of love and that their relationship is normal, romantic, and consensual. They do not interpret what is happening to them as abuse, but as love and affection, and they may continue in that belief well into adulthood*. O'Donnell testified that when she began treating plaintiff in early 1998, plaintiff had only recently begun to identify the sexual abuse in her past as the cause of her current mental health problems. Plaintiff filed her complaint shortly thereafter, on July 16, 1998.

*Id.* at 212–13 (emphasis added).

10 – OPINION AND ORDER

Unlike Jasmin, who was sexually abused at the age of 10 years old, D.T. was over 30 years old when last abused by Shoemaker. Although she was "[f]rightened and in shock [and] felt like she had no other choice" she was forced to ingest cocaine. FAC ¶ 84. "Throughout the rest of the night, Shoemaker and ONeal performed nonconsensual sex acts on D.T. D.T. repeatedly blacked out and did not feel in control of her body." FAC ¶ 84. Being sexually assaulted while blacked out on cocaine, while forced to wear "a dog collar and . . . clamps on her nipples for hours" alerted D.T. to the fact that these assaults were far removed from the teachings she hoped to learn from Shoemaker. The FAC is unequivocal in D.T.'s understanding that the sex acts were not consensual. Additionally, D.T. certainly realized Shoemaker and ONeal physically injured her, going so far as to seek treatment from two doctors for injuries suffered from the abuse. D.T. "told [the doctors] about the physical and sexual assaults that she endured, the group sex, and how she was forced to take drugs." FAC ¶ 94. These allegations are a far cry from a teenager who had what she firmly believed to be a consensual and loving sexual relationship with an adult (and only realized years later that the relationship was abusive).

The Jasmin plaintiff did not connect her injury to any abuse because she was not aware the relationship was abusive. In contrast, by August 2008 D.T. knew she had received physical injuries from the sexual abuse *and* she connected those injuries *at the time* with Shoemaker's sexual abuse. In August 2008, D.T. was "covered in cuts and bruises from Defendants' abuse." FAC ¶ 87. "Although D.T. was drugged, disoriented, and unable to consent, Shoemaker forced D.T. to perform oral sex on him repeatedly throughout the night even as D.T. lost and regained consciousness." FAC ¶ 90. During this time, Shoemaker "smothered and gagged" D.T. FAC ¶ 90. As noted, D.T. sought medical treatment from two doctors as a result of injuries sustained during

the assault. In other words, D.T. not only "discovered her injury" back in 2008, but she also connected that injury to the sexual assault at that time.

In Oregon, a plaintiff discovers an injury when they know or reasonably should know facts making them aware of a substantial possibility that a tort was committed against them by the defendant. *Gaston v. Parsons*, 864 P.2d 1319, 1323–24 (Or. 1994). A plaintiff does not need to know a specific legal theory of recovery or even the full extent of their injury for the statute of limitations clock to begin. *See Id.* at 1325 (statute of limitations runs when the plaintiff knows (or should know) facts demonstrating "a substantial possibility that he or she had suffered damage as a result of the tortious conduct."); *see also Dickson v. TriMet*, 412 P.3d 1188, 1192 (Or. Ct. App. 2018) (holding that a statute of limitations period is not tolled until the plaintiff is aware of the full extent of harm caused by a tortious act); *Raethke v. Oregon Health Scis. Univ.*, 837 P.2d 977, 979 (Or. Ct. App. 1992) (*en banc*) (finding the statute of limitations clock began when the injured party should have known a surgery was negligently performed, not when she later learned it rendered her "permanently infertile."). Additionally, *the detection of additional or different injuries resulting from an original tortious act does not restart the statute of limitations clock*. *Dunn v. City of Milwaukie*, 348 P.3d 301, 304-05 (Or. Ct. App. 2015). Several Oregon cases are instructive to the outcome here.

In *Dunn*, the plaintiff "heard a loud roar" and was shocked to see sewage flowing into her home from her toilet and shower. Plaintiff saw a city work crew outside cleaning the sewer lines, and one worker informed Plaintiff that the crew "used too much pressure." Plaintiff returned inside to find three to four inches of water in every room of the house. Plaintiff spent several hours cleaning up the mess, but never observed "any buckling, warping, or other signs of water damage to the floors or walls." Months later, Plaintiff discovered that wastewater had saturated

the subflooring, causing the floors to buckle. Plaintiff argued the limitations period began not when she initially cleaned up the mess, but when she discovered the serious water damage months later. The court noted the limitations period ran once Plaintiff discovered the injury: i.e., when plaintiff discovered, or should have discovered, "the existence of three elements: (1) harm; (2) causation; and (3) tortious conduct." *Id.* In rejecting Plaintiff's argument, the court found the case "involves a single incident in which plaintiff suffered immediately identifiable harm; thus the fact that plaintiff did not know the full extent of the harm—*e.g.*, structural damage in addition to other harm from the flooding (including damage to personal property)—is not sufficient to save her claim from the running of the notice period." *Id*. at 306-07.

Similarly, "[t]he specific issue posed [in *Guiley v. Hammaker*,] is whether the statute of limitations for actions in tort for personal injury begins to run when the plaintiff knows he has been injured by the wrongful conduct of another, although he does not then know the full extent of the injury." 640 P.2d 664, 665 (Or. 1982). There, a newborn suffered "a small abrasion on the head . . . [with] no other apparent injuries" in a car crash. *Id.* Seven years later, after exhibiting learning problems in school, his parents discovered the child "sustained probable damage to an optic nerve, resulting in impaired acuity on the right eye." *Id.* In rejecting Plaintiff's argument that the statute did not begin until they discovered the optic nerve damage, the Court concluded:

> The discovery rule is a judicial thumb on the scales of justice, designed to ameliorate the potentially harsh consequences of a broad application of statutes of limitation. It is an equitable adjustment in, not an abrogation of, such statutes. We would be abrogating the policy of the statute of limitations if we were to hold that a plaintiff with notice of both an injury and its cause would be excused from bringing an action until he had determined the full extent of the consequences of the wrong done him."

*Id.* at 667.

Because D.T. knew she had been injured by Shoemaker's sexual assault back in 2008, her claim arose at that time. Although D.T. did not know the full extent of her psychological

13 – OPINION AND ORDER

injuries until many years later, her statute of limitations clock does not restart with every realization of any new psychological injury stemming from Shoemaker's sexual abuse. This fact—that D.T. could have brought a claim for sexual abuse against Shoemaker back in August 2008—distinguishes D.T.'s claims from those cited in her brief.

*Skille*, the other case relied on by D.T., is also distinguishable from the facts present here. Skille brought an assault and battery claim against an employee of the Oregon State Hospital. Skille alleged that while she was a resident of the hospital, a transport employee took advantage of her mental illness and vulnerability and groomed her to provide sexual favors during multiple trips away from the hospital. The employee led plaintiff to believe they were in a romantic relationship, with plaintiff often performing oral sex on the employee in the hospital vehicle. Plaintiff alleged the grooming (buying her presents, telling plaintiff she was "normal," etc), and the employee's position of power led "Plaintiff to believe they were involved in a romantic relationship so that Plaintiff would not realize that the sexual touching was offensive." *Skille*, 288 Or. App. at 212. Plaintiff alleged that due to the grooming and her mental condition, she did not discover the sexual contact was inappropriate (and harmful) until she learned the employee "was going to be prosecuted for his crimes and that there were other women he had been involved with." *Id.*

Stated differently, at the time of the abuse, Skille believed that she was in a consensual, loving relationship with that defendant. In contrast, D.T.'s specific factual allegations confirm that, despite being groomed by Shoemaker, she perceived (or, at the very least, should have perceived) that some of Shoemaker's touching in August 2008 was offensive.[6] Because the

_____

[6] In January 2006, D.T. stopped Shoemaker when he attempted to kiss her "without her consent." FAC ¶ 53. As alleged by D.T., "[s]he was uninterested in him romantically, but rather looked up to him as a teacher, a healer, and authority figure." FAC ¶ 53. Nearly one year later, even though D.T. engaged in sexual intercourse with Shoemaker, she realized even at that time that the sex was not consensual. "D.T. was genuinely scared and intimidated by

allegations demonstrate that D.T. knew the touching was offensive back in 2008, and because the

allegations demonstrate that D.T. realized at that time that she had been injured by the offensive

contacts, her clock started running at that time. *See Doe v. Lake Oswego Sch. Dist.*, 353 Or. 331,

335 (2013) ("We also do not mean to imply that a limitations period does not begin to run until a

plaintiff knows the full extent of the harm that has been inflicted or becomes aware of the legal

implication of facts rather than of the facts themselves. Defendant is correct that, if a plaintiff

knows that he or she has suffered some harm and knows that it is the result of tortious conduct,

an argument that the plaintiff did not know the full extent of the harm or that those facts had

legal significance will be of no avail.").

   In the alternative, D.T. argues her claims are subject to equitable tolling. A party seeking

equitable tolling must establish "(1) that he has been pursuing his rights diligently, and (2) that

some extraordinary circumstance stood in his way and prevented timely filing." *Holland v.*

*Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005)

(cleaned up). The Court agrees with the Defendants that, for numerous reasons, equitable tolling

is not appropriate here.

   The allegations confirm that on multiple occasions after Shoemaker began sexually

abusing D.T., D.T. voluntarily left the Center and returned home to Australia. In fact, on *at least*

*three occasions* following the graphic August 2008 sexual assaults, Plaintiff chose to return to

Australia after spending time at the Center. FAC ¶¶ 93, 95. During these post-August 2008 visits,

---

Shoemaker, and she felt overwhelmed by his aggressive energy. D.T. felt that she was unable to avoid or rebuff
Shoemaker due to his roles as her teacher, healer, and leader of the Center." FAC ¶ 65. And during the August 2008
assaults, D.T. recognized at that time that the interactions with Shoemaker and ONeal were not consensual. For
instance, D.T. alleges that she only removed her clothes and crawled into the bedroom when ordered because she
"was afraid of the potential reprisal that would occur if she did not listen . . . ." FAC ¶ 83. Similarly, D.T. did not
voluntarily ingest cocaine that evening. Instead, Shoemaker "demanded that D.T. snort cocaine. Frightened and in
shock, D.T. felt like she had no other choice." FAC ¶ 84. Although the graphic and violent assaults alleged here are
a far cry from the offensive touching at issue in *Jasmin*, *Doe,* and *Skille*, the above allegations, in tandem with the
specific allegations demonstrating D.T. was physically unable to consent to the August 2008 abuse conclusively
establish that D.T. realized at the time that the conduct was far from consensual.

"Shoemaker continued to sexually exploit D.T." FAC ¶ 95. No Defendant prohibited D.T. from leaving the Center and returning home to Australia. In short, no action from any Defendant prevented D.T. from filing her claims 15 years ago, shortly after the abuse at issue. Additionally, although D.T. "entered a deep depression" from 2011 through 2016, she emerged from the worst of those symptoms by early 2017. FAC ¶ 99. Despite emerging from her depression, D.T. did not file her claims until *nearly seven years later*, in October 2023. In fact, D.T. waited at least one year to file any claims despite reading a series of articles in 2022 outlining Shoemaker's "rampant" physical and psychological abuse of women at the Center. FAC ¶¶ 100–01. The Court concludes D.T. did not diligently pursue her claims and her claims are not entitled to equitable tolling.

## CONCLUSION

For the above reasons, Defendants' Motions to Dismiss, ECF No. 46 and ECF No. 47, are GRANTED in part. Because D.T.'s claims are barred by the relevant statutes of limitations, her claims are DISMISSED, with prejudice. Plaintiff G.M. is granted 30 days to file a Second Amended Complaint.[7]

IT IS SO ORDERED.

DATED this 30th day of October, 2024.

_____/s/ Michael McShane_____
**Michael J. McShane**
**United States District Judge**

---

[7] G.M.'s Complaint was 30 pages long. ECF No. 1. The FAC, containing G.M.'s claims along with D.T.'s claims, ballooned to over 90 pages containing more than 400 paragraphs of allegations. Many of those pages contain allegations and counts that are of little, if any, relevance to G.M.'s claims. The Court is of the opinion that in large part due to the unwieldy size of the FAC, the briefs—of all parties—tended to commingle the arguments and theories rather than focus on the specific arguments as to each Plaintiff. The Court finds it most efficient to require G.M. to file a Second Amended Complaint and address motions against those claims, if necessary, at that time.